## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**                                       **NO.: 22-69**

**TRAVIS BROWN**                                 **SECTION: "G"**

## ORDER AND REASONS

Pending before the Court is Defendant Travis Brown's ("Brown") Motion to Suppress Evidence.[1] Brown argues that the government violated his Fourth Amendment rights when law enforcement officers searched the vehicle he was occupying without a warrant.[2] Therefore, Brown argues that the Taurus G2C 9mm firearm recovered during the search must be suppressed.[3] The government opposes the motion and argues that the search did not violate the Fourth Amendment.[4] The Court held an evidentiary hearing on the motion on February 9, 2023.[5] For the reasons discussed in detail below, the police had reasonable suspicion to stop Brown and perform a protective sweep of the vehicle. Accordingly, having considered the motion, the memoranda in support and in opposition, the evidence and testimony presented at the evidentiary hearing, the record, and the applicable law, the Court denies the motion.

---

[1] Rec. Doc. 35.

[2] Rec. Doc. 35-1 at 1.

[3] *Id.*

[4] Rec. Doc. 43.

[5] Rec. Doc. 54.

# I. Background

### A.    *Procedural Background*

On April 21, 2022, Brown was charged by an Indictment in the Eastern District of Louisiana with being a felon in possession of a firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).[6] This matter is scheduled for a jury trial to begin on April 17, 2023.[7]

On January 6, 2023, Brown filed the instant Motion to Suppress Evidence.[8] On January 27, 2023, the government filed an opposition to the motion.[9] On February 3, 2023, Brown filed a reply brief in further support of the motion.[10] The Court held an evidentiary hearing on the motion on February 9, 2023.[11] At the hearing, the government called Officer Jonathan Hirdes and Officer Troy Yarish, and the defense called Officer Anton Huguley.[12]

### B.    *Factual Background[13]*

Brown's felon in possession of a firearm charge arises out of an encounter with the New Orleans Police Department ("NOPD") that occurred on December 5, 2021 at approximately 1:15

---

[6] Rec. Doc. 1.

[7] Rec. Doc. 29. The trial date was originally set for July 11, 2022, but the date was continued on two occasions at the request of the parties. *See* Rec. Docs. 24, 25, 28, 29.

[8] Rec. Doc. 35.

[9] Rec. Doc. 43.

[10] Rec. Doc. 50.

[11] Rec. Doc. 54.

[12] *Id.*

[13] This factual background is derived from the officers' testimony and the evidence presented at the evidentiary hearing.

AM.[14] That morning, a New Orleans 911 dispatcher received a call from an individual who identified himself as "Michael."[15] Michael stated that he had just left the East Side Cash and Carry on the corner of Chef Menteur Highway and Werner Drive.[16] According to Michael, he saw a black male wearing a red ski mask pulled over his face, white t-shirt, and dark pants jump out of a car "waiving a gun around."[17] Michael stated that the man was standing by a white Dodge Magnum, and he saw a woman sitting inside the car.[18] Michael stated that he was not in danger as he had left the location.[19]

Following the call, Officers Yarish and Huguley of the NOPD were dispatched to investigate "an aggravated assault" at the East Side Cash and Carry.[20] Officer Hirdes was also dispatched as an assisting unit.[21] When they were dispatched, the officers received a brief synopsis of the report and a description of the perpetrator, but they did not hear the 911 call.[22]

Officers Yarish and Huguley were first to arrive at the scene.[23] When they arrived, they observed Brown sitting in the driver's seat and a woman sitting in the passenger's seat of a white

---

[14] Rec. Doc. 43-1 at 3.

[15] 911 Audio Recording.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] Police Incident Report at 3.

[21] Testimony of Officers Hirdes, Yarish, and Huguley.

[22] Testimony of Officer Hirdes.

[23] *Id.*; Def. Ex. D (Officer Huguley body camera footage).

Dodge Magnum parked in front of the building.[24]  Officer Yarish testified that both Brown and the vehicle matched the description they had been given from the dispatcher.[25]  The officers ordered Brown to show his hands and exit the vehicle.[26]  Brown complied with these commands and exited the vehicle without incident.[27]  As Brown exited the vehicle, the front driver's side door was left open.[28]  Officer Yarish then began to place Brown in handcuffs.[29]

As Officer Yarish was placing Brown in handcuffs, responding unit Officer Hirdes arrived at the scene.[30]  Officer Hirdes stood at the exterior of the open driver's side door, used a flashlight to look into the interior of the car, and directed the female passenger to step out of the vehicle.[31]  Officer Huguley then informed Brown that they had stopped him because they had received a call regarding an aggravated assault.[32]  Officer Huguley told Brown that they were going to advise him of his rights and "ask him any question."[33]  Officer Huguley informed Brown that "just because he was in handcuffs the handcuffs could come right off" after they looked into the call.[34]  At this

---

[24] Testimony of Officer Yarish; Police Incident Report at 3; Def. Ex. D (Officer Huguley body camera footage).

[25] Testimony of Officer Yarish. When the officers arrived, Brown was wearing a black sweatshirt over a white t-shirt. *Id.* Brown was wearing camouflage pants. *Id.* Brown was wearing a red ski cap when he exited the vehicle. Gov't Ex. 2 (Dash camera footage) at 1:24.

[26] Def. Ex. D (Officer Huguley body camera footage) at 1:47–1:50.

[27] *Id.* at 1:50.

[28] *Id.*

[29] Def. Ex. C (Officer Hirdes body camera footage) at 1:48.

[30] *Id.*

[31] *Id.* at 1:50–1:54.

[32] Def. Ex. D (Officer Huguley body camera footage) at 2:50–2:51.

[33] *Id.* at 2:53–2:55.

[34] *Id.* 2:57–3:00.

point, Brown was only being detained; he had not been placed under arrest.[35]

Shortly thereafter, Officer Yarish finished handcuffing Brown, read Brown his *Miranda* rights, and escorted Brown to the back of the police vehicle.[36] As soon as Officer Yarish escorted Brown away from the Dodge Magnum, Officer Hirdes moved to stand in the space between the open driver-side door and the vehicle.[37] Officer Hirdes then ducked his arm and upper body inside the car, adjusted the volume on the radio, and exited the vehicle.[38] Officer Hirdes testified that he proceeded to do a "quick scan" or "protective sweep" of the vehicle for a firearm because the 911 caller had reported a firearm.[39] According to the testimony of Officers Hirdes and Huguley, a protective sweep is always performed in this type of investigation for the safety of the officers and the public.[40] Officer Yarish also testified that the officers' primary duty was to secure the scene.[41]

Officer Hirdes then went to the front of the vehicle and spoke to the female passenger.[42] Officers Hirdes and Huguley both testified that they did not detain the passenger because they did not have any information that she was a perpetrator of any crime.[43] Officer Hirdes went to the passenger side of the vehicle, opened the front passenger's door, and shined his flashlight into the

---

[35] Testimony of Officer Hirdes.

[36] Def. Ex. D (Officer Huguley body camera footage) at 3:28–4:44.

[37] Def. Ex. C (Officer Hirdes body camera footage) at 3:33.

[38] *Id.* at 3:39–3:46; Testimony of Officer Hirdes. According to Officer Hirdes's testimony, he was not looking for the firearm when he initially reached into the vehicle to lower the radio.

[39] Testimony of Officer Hirdes.

[40] *Id. See also* Testimony of Officer Huguley.

[41] Testimony of Officer Yarish.

[42] Def. Ex. C (Officer Hirdes body camera footage) at 4:06–4:29.

[43] Testimony of Officers Hirdes and Huguley.

vehicle.[44] Officer Hirdes then walked back to the driver's side of the vehicle, shined his flashlight under the seat, and directed Officer Yarish to "look under the seat."[45] Officer Hirdes testified that this was the moment when he discovered the firearm, which was located "three or four inches" underneath the driver's seat.[46] Officer Hirdes testified that he did not immediately recover the firearm because he did not know if the firearm was possessed legally.[47]

Officer Huguley then ran Brown's information through docket master and observed that Brown was a convicted felon.[48] After learning that Brown was a convicted felon from Officer Huguley, Officer Hirdes returned to the vehicle and recovered the firearm.[49] Thereafter, Brown was placed under arrest for being a felon in possession of a firearm.[50] Officer Huguley informed Brown that he was not being charged with aggravated assault because the 911 caller was not responding to follow-up phone calls from the police.[51] After the arrest, Officer Huguley wrote a Police Incident Report, which states that the firearm was "located underneath the driver seat of the white Dodge . . . in plain view of the officers."[52]

---

[44] Def. Ex. C (Officer Hirdes body camera footage) at 4:38–5:18.

[45] *Id.* at 5:19–5:35.

[46] Testimony of Officer Hirdes.

[47] *Id.*

[48] Police Incident Report at 3; Def. Ex. C (Officer Hirdes body camera footage) at 10:09–10:12; Def. Ex. D (Officer Huguley body camera footage) at 10:26–10:45. While Officer Huguley was performing the search, Officer Yarish went into the store to ask if any witnesses had seen the crime reported by the 911 caller. Testimony of Officer Yarish. The cashier told Officer Yarish that he had seen someone waiving a gun. *Id.* The cashier also said he called the police because he saw someone using drugs near the dumpster. *Id.*

[49] Testimony of Officer Hirdes; Def. Ex. C (Officer Hirdes body camera footage) at 11:10–11:40.

[50] Testimony of Officer Hirdes; Police Incident Report at 3; Def. Ex. D (Officer Huguley body camera footage) at 11:32–11:50.

[51] Def. Ex. D (Officer Huguley body camera footage) at 11:55–12:08. Testimony of Officer Huguley.

[52] Police Incident Report at 3; Testimony of Officer Huguley.

## II. Parties' Arguments

### A.    Brown's Arguments in Support of the Motion

Brown argues that the government violated his Fourth Amendment rights when law enforcement officers searched the vehicle he was occupying without a warrant.[53] Therefore, Brown argues that the Taurus G2C 9mm firearm recovered during the search must be suppressed.[54] Brown asserts that Officer Hirdes searched the vehicle when he reached his arm and upper body inside to look under the driver's seat.[55] Since Officer Hirdes did not have a warrant, Brown submits that "the search was presumptively unreasonable, and it is not evident that any exception to the warrant requirement applies."[56] Although it is well established that a police officer may seize evidence in plain view, Brown submits that this exception does not apply because the firearm was not in plain view prior to the warrantless search.[57] Brown asserts that Officer Hirdes was not able to see the firearm before conducting the search because it was completely hidden beneath the driver's seat.[58] Therefore, Brown argues that the plain view exception does not justify the warrantless seizure of the firearm.[59]

### B.    The Government's Arguments in Opposition to the Motion

The government opposes the motion and argues that the NOPD officers lawfully seized the

---

[53] Rec. Doc. 35-1 at 1.

[54] *Id.*

[55] *Id.* at 6.

[56] *Id.* at 7–8.

[57] *Id.* at 8.

[58] *Id.*

[59] *Id.*

gun from the car in the area where Brown was seated.[60] The government contends that "[t]he officers had particularized information regarding a crime involving a firearm, a description of the perpetrator, and the vehicle possessed by the perpetrator at the time of the crime."[61] Considering that the officers saw a person matching the description of the perpetrator and the vehicle when they arrived at the scene, the government asserts that the officers had "at least reasonable suspicion that a crime had occurred and that Brown was the perpetrator of that reported crime."[62]

The government asserts that the 911 call led to reasonable suspicion by the officers that would justify an investigatory stop.[63] The government contends that "[t]he 911 recording demonstrates that the caller was an eyewitness of the event, called just after seeing the person in the red ski mask, white t-shirt, dark pants in a Dodge magnum vehicle, wave a gun at him in the parking lot, and utilized the 911 system, going so far as to leave his first name and phone number."[64] The government argues that the 911 caller's information was corroborated because, when the officers arrived at the location given by the caller minutes after receiving the call, they discovered a person matching the exact description of the alleged perpetrator, a car matching the description provided, and a female in the car as described by the caller.[65] Therefore, the government submits that the officers were justified in doing a search of the vehicle under the

---

[60] Rec. Doc. 43 at 3.

[61] *Id.*

[62] *Id.* at 3–4.

[63] *Id.* at 4.

[64] *Id.*

[65] *Id.* at 5.

protective sweep exception to the Fourth Amendment.[66]

The government points out that the Incident Report states that the gun was "located under the driver's seat of the Dodge that was in plain view of the officers."[67] Nevertheless, the government submits that the issue of whether the gun was in plain view is immaterial "[b]ecause the officers had particular and articulable justification for opening the car door and looking on the floorboard."[68] The government argues that it was not necessary for the officers to articulate the reason for looking in the car in the police report, because the facts and circumstances justified their actions.[69]

### C.    Brown's Arguments in Further Support of the Motion

In reply, Brown argues that the search cannot be justified as a protective sweet because: "(1) officers lacked reasonable suspicion to stop Brown, and, in the alternative, (2) officers lacked reasonable suspicion that Brown was armed and dangerous and would gain immediate access to weapons during or after the stop."[70]

First, Brown argues that the officers did not have reasonable suspicion to stop him because the anonymous tip was presumptively unreliable and was not independently corroborated by the officers before seizing Brown.[71] Brown asserts that "the tip was not credible or reliable because the caller failed to provide reliability-enhancing hallmarks, such as a full name, address, or

---

[66] Id. (citing United States v. Rodriguez, 33 F.4th 807, 814 (5th Cir. 2022)).

[67] Id. at 7.

[68] Id.

[69] Id.

[70] Rec. Doc. 50 at 1.

[71] Id. at 2–4.

working phone number."[72] Brown contends that "the fact that the tipster provided accurate information about 'readily observable location and appearance' is not sufficient to verify the allegation of illegal activity."[73] Since there was no reasonable suspicion to justify an investigatory stop, Brown asserts that the subsequent protective sweep of the vehicle was unlawful.[74]

Second, even assuming that the *Terry* stop was permissible, Brown contends that the officers lacked reasonable suspicion that Brown posed a danger or that he would gain immediate control of weapons.[75] Therefore, Brown argues that a protective sweep for officer safety cannot justify the search of the vehicle.[76]

### III. Legal Standard

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[77]

"The Fourth Amendment proscribes 'unreasonable searches and seizures.'"[78] "A warrantless search is presumptively unreasonable unless it falls within an exception to the Fourth

---

[72] *Id.* at 4.

[73] *Id.* at 5 (quoting *Florida v. J.L.* 529 U.S. 266, 268 (1994)).

[74] *Id.* at 7.

[75] *Id.*

[76] *Id.* at 10.

[77] U.S. Const. amend. IV.

[78] *United States v. Oliver*, 630 F.3d 397, 405 (5th Cir. 2011) (quoting U.S. Const. amend. IV).

Amendment's warrant requirement."[79]  Generally, "on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights," but "if a defendant produces evidence that he was arrested or subject to search without a warrant, the burden shifts to the government to justify the warrantless search."[80]

"While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."[81]  "[A]n officer's momentary reaching into the interior of a vehicle [does] constitute a search."[82]  Indeed, the Fifth Circuit has held that an officer conducts a search when "he pierce[s] the airspace inside the vehicle."[83]

The Fourth Amendment permits brief investigative stops, which are commonly referred to as *Terry* stops, when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."[84]  The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability."[85]  "The reasonable suspicion inquiry is qualitative and quantitative; it depends 'upon both the content of information possessed by police and its degree

---

[79] *United States v. Guzman*, 739 F.3d 241, 245–46 (5th Cir. 2014).

[80] *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (internal citations omitted).

[81] *New York v. Class*, 475 U.S. 106, 114–15 (1986).

[82] *United States v. Jones*, 565 U.S. 400, 410 (2012) (citing *Class*, 475 U.S. at 114–15).

[83] *United States v. Ryles*, 988 F.2d 13, 15 (5th Cir. 1993).

[84] *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

[85] *Alabama v. White*, 496 U.S. 325, 330 (1990).

of reliability.'"[86] "Thus, a law enforcement officer acts with reasonable suspicion if, based on the totality of the circumstances, he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[87]

A 911 call can lead to reasonable suspicion by the officers that would justify an investigatory stop.[88] Each case is evaluated individually, and four factors must be considered to make that determination: "(1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or recent activity has gone stale."[89]

## IV. Analysis

Brown argues that the government violated his Fourth Amendment rights when law enforcement officers searched the vehicle he was occupying without a warrant.[90] Brown originally argued that Officer Hirdes searched the vehicle when he reached his arm and upper body inside to look under the driver's seat and that the plain view exception does not justify the warrantless seizure of the firearm.[91] The government does not dispute that a warrantless search of the vehicle occurred, and it does not argue for application of the plain view exception.[92] Instead, the

---

[86] *United States v. Rose*, 48 F.4th 297, 302 (5th Cir. 2022) (quoting *White*, 496 U.S. at 330).

[87] *Id.* (quoting *Cortez*, 449 U.S. at 417–18).

[88] *Id.*

[89] *Id.* at 302–03 (quoting *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010)).

[90] Rec. Doc. 35-1 at 1.

[91] *Id.* at 6–9.

[92] Rec. Doc. 43 at 7.

government contends that the 911 call led to reasonable suspicion by the officers that would justify an investigatory stop and a protective sweep of the vehicle.[93] In reply, Brown argues that the search cannot be justified as a protective sweep because: "(1) officers lacked reasonable suspicion to stop Brown, and, in the alternative, (2) officers lacked reasonable suspicion that Brown was armed and dangerous and would gain immediate access to weapons during or after the stop."[94] The Court begins by addressing whether the officers had reasonable suspicion to stop Brown, and then addresses Brown's alternative argument that the officers lacked reasonable suspicion that Brown was armed and dangerous and would gain immediate access to weapons during or after the stop.

### A.    *Whether the Officers Had Reasonable Suspicion to Stop Brown*

As stated above, the Court considers four factors in determining whether a 911 call can supply reasonable suspicion to justify an investigatory stop: "(1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or recent activity has gone stale."[95] In 2022, the Fifth Circuit considered a similar case, *United States v. Rose*, and concluded that the police officers conducted a constitutionally valid investigatory stop.[96] There, a 911 caller "reported a suspicious confrontation, possibly an armed robbery, transpiring in the parking lot of a Dallas liquor store."[97] "The caller, whose number was

---

[93] *Id.* at 4–5.

[94] Rec. Doc. 50 at 1.

[95] *Rose*, 48 F.4th at 302–03 (quoting *Gomez*, 623 F.3d at 269).

[96] *Id.* at 300.

[97] *Id.*

logged although he declined to identify himself, described seeing two people sitting in a white Ford Crown Victoria parked beside the store near a trash can."[98] The caller described an individual who was sitting in the driver's seat and threatening the passenger with a black handgun that had an extended clip.[99] The caller stated that no shots were fired, but it appeared that the suspect took pills from the passenger.[100]

Police officers were dispatched to the scene within five minutes of the call, and observed a person who matched the description of the suspect standing behind a dumpster.[101] One officer searched behind the dumpster, where he found a firearm, and another officer searched the Crown Victoria, where he found several baggies of marijuana.[102] The suspect was then charged with unlawful possession of a firearm.[103] The district court partially granted a motion to suppress, suppressing all evidence collected from the search of the vehicle and the search of the defendant, but it did not suppress the firearm.[104] The government appealed and the Fifth Circuit reversed that determination, concluding that the 911 call supplied reasonable suspicion for the investigatory stop and search of the vehicle.[105] As the Fifth Circuit did in *Rose*, the Court considers the four factors to determine whether the 911 call supplied reasonable suspicion for the investigatory stop and

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.* at 301.

[102] *Id.*

[103] *Id.*

[104] *Id.* at 301, n.2.

[105] *Id.* at 303–06.

search of the vehicle.

### 1.     The Credibility and Reliability of the Informant

The tip that led NOPD officers to investigate Brown came from a 911 caller who identified himself only as "Michael" and did not provide a last name.[106]  In *Rose*, the Fifth Circuit also considered the credibility and reliability of an informant who provided an anonymous 911 tip.[107] The Fifth Circuit observed that "three factors, taken together, support a decision by law enforcement to credit the reliability of anonymous tips: the informant (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing and voice recording."[108]

These sub-factors are established here. The 911 caller, Michael, asserted eyewitness knowledge of the reported event.[109]  During the 911 call, Michael stated that he had just left the East Side Cash and Carry on the corner of Chef Menteur Highway and Werner Drive.[110] According to Michael, he saw a black male wearing a red ski mask pulled over his face, white t-shirt, and dark pants jump out of a car "waiving a gun around."[111]  Michael stated that the man was standing by a white Dodge Magnum, and he saw a woman sitting inside the car.[112]  Michael also told the 911 dispatcher that he had witnessed these events less than five minutes before making

---

[106]  Gov't Ex. 4 (911 audio).

[107]  *Rose*, 48 F.4th at 303.

[108]  *Id.* (citing *Navarette v. California*, 572 U.S. 393, 398–401 (2014)).

[109]  Gov't Ex. 4 (911 audio).

[110]  *Id.*

[111]  *Id.*

[112]  *Id.*

the call, and thus the tip was reported contemporaneously with the event.[113]  Finally, Michael used

the 911 emergency system, which permits call tracing and voice recording.[114]  Therefore, this

factor weighs in favor of the government.

### 2.      The Specificity of the Information Contained in the Tip

Brown concedes that the 911 caller provided specific information about the individual he

saw at the gas station, but he argues that the information regarding the alleged illegal activity was

vague. Brown relies on *Florida v. J.L.*, where the Supreme Court held that no reasonable suspicion

arose from an anonymous tip that "a young black male standing at a particular bus stop and wearing

a plaid shirt was carrying" a concealed gun.[115]  The Court noted that the tipster's "accurate

description" of the suspect's "readily observable location and appearance" was reliable in the

"limited sense" that it helped the police "identify correctly the person whom the tipster mean[t] to

accuse."[116]  However, the Supreme Court noted that the tip did "not show that the tipster ha[d]

knowledge of concealed criminal activity."[117]  Because the tip "provided no predictive

information," it left "the police without means to test the informant's knowledge or credibility,"

and thus lacked even a "moderate indicia of reliability."[118]

In *Rose*, the Fifth Circuit found that an anonymous 911 caller provided specific information

when "[h]e said that a black male—wearing a black hoodie, red pants, and white and gold

---

[113]  *Id.*

[114]  Although the police officers were unable to reach Michael after stopping Brown, Michael also provided
a phone number to the 911 dispatcher.

[115]  *J.L.*, 529 U.S. at 268.

[116]  *Id.* at 272.

[117]  *Id.*

[118]  *Id.* at 271.

'Jordans'—was seated in the driver's seat and threatening the passenger, who he did not describe, with a black handgun that had an extended clip. No shots were fired, but it appeared, the caller said, that the suspect took pills from the passenger."[119]  The Fifth Circuit observed that "other than a description of the individual in the passenger seat, a license plate number, and his own relation, if any, to the unfolding events, it is unclear what further details an eyewitness to such a scene could have provided."[120]

This case is more similar to *Rose* than to *J.L.* Unlike the tipster in *J.L.*, here, the 911 caller stated that he saw a black man at the East Side Cash and Carry wearing a red ski mask pulled over his face, white t-shirt, and dark pants jump out of a car "waiving a gun around."[121]  The officers were then dispatched to investigate an aggravated assault.[122]  Louisiana Revised Statute § 14:36 defines assault as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." Louisiana Revised Statute § 14:37 defines aggravated assault as an assault committed with a dangerous weapon. The elements of aggravated assault under Louisiana law are: "(1) the intent-to-scare mental element (general intent); (2) conduct by defendant of the sort to arouse a reasonable apprehension of bodily harm; and (3) the resulting apprehension on the part of the victim."[123]

The 911 caller stated that the alleged perpetrator was "waiving a gun around" at a busy

---

[119]  *Rose*, 48 F.4th at 300.

[120]  *Id.* at 304.

[121]  Gov't Ex. 4 (911 audio).

[122]  Testimony of Officers Hirdes, Yarish, and Huguley.

[123]  *State v. Brown*, 2017-0124 (La. App. 4 Cir. 12/12/17), 234 So. 3d 978, 982, *writ denied*, 2018-0010 (La. 6/15/18), 257 So. 3d 678.

corner store.[124] Although the caller did not provide specific information to show that the alleged perpetrator pointed the gun at someone or otherwise engaged in conduct that would arouse a reasonable apprehension of bodily harm, it was reasonable for police officers to investigate further based on information that the alleged perpetrator was "waiving a gun around" at a busy store.[125]

Brown argues that this case is similar to *J.L.* because the 911 caller failed to provide any "predictive information and therefore left the police without means to test the informant's knowledge or credibility."[126] However, the Fifth Circuit has "expressly held that there is no *per se* rule prohibiting investigatory stops based on anonymous tips that fail to provide predictive information."[127] Such a rule applies where the alleged criminal conduct is concealed, and the informant does not explain how he knew about the allegations.[128]   "[T]he need for predictive information is context dependent and is less important when the informant professes to see the alleged criminal activity unfolding in the open."[129] Although the 911 caller did not provide any predictive information, the information was highly specific and concerned events that were

---

[124] Gov't Ex. 4 (911 audio).

[125] In *Rose*, the 911 caller "reported a suspicious confrontation, possibly an armed robbery." *Rose*, 48 F.4th at 300. The caller did not report seeing a robbery, but he stated that the driver was threatening the passenger with a black handgun. *Id.* In this case, even if "waiving a gun around" in a public place is not sufficient to prove an aggravated assault, it could potentially have given rise to other charges. For example, under Louisiana Revised Statute § 40.1(B)(1)(a), a person may be charged with "menacing," defined as:

> the intentional communication of information that the commission of a crime of violence . . . is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, when . . . [t]he actions of the offender cause members of the general public to be in sustained fear for their safety, and a reasonable person would have known that such actions could cause such sustained fear.

[126] Rec. Doc. 50 at 5 (quoting *J.L.*, 529 U.S. at 271).

[127] *Rose*, 48 F.4th at 304 (citing *Gomez*, 623 F.3d at 270).

[128] *Id.* (citing *J.L.*, 529 U.S. at 271–72).

[129] *Id.* (citing *Navarette*, 572 U.S. at 399).

unfolding in the open. Therefore, this factor weighs in favor of the government.

### 3. The Extent to Which the Information in the Tip can be Verified by Officers in the Field

Brown contends that the officers should have attempted to verify the tip before temporarily detaining Brown and searching the vehicle.[130] Again, *Rose* is instructive. There, the Fifth Circuit found that "the information conveyed by the informant was mostly consistent with what the officers discovered when they arrived on the scene."[131] Although there were some discrepancies between the tip and the scene the officers confronted, the Fifth Circuit found "it unreasonable to suggest that the officers, given what they knew and saw, are required to simply walk away from this scene without any further investigation."[132]

Like Brown argues here, the district court in *Rose* "emphasized that what the officers found at the scene 'did not corroborate the reported criminal activity.'"[133] However, the Fifth Circuit found this reasoning to be misplaced because it misconstrued the Supreme Court's holding in *J.L.*[134] Unlike the tipster in *J.L.* who did "not show that the tipster ha[d] knowledge of concealed criminal activity," the Fifth Circuit pointed out that the 911 caller "explained exactly how he knew about the alleged criminal activity: he was an eyewitness to conduct occurring in plain view at a public place."[135] As to this factor, the instant case is again more similar to *Rose* than to *J.L.*

---

[130] Rec. Doc. 50 at 6.

[131] *Rose*, 48 F.4th at 304.

[132] *Id.* at 305.

[133] *Id.*

[134] *Id.*

[135] *Id.* (quoting *J.L.*, 529 U.S. at 272).

Therefore, this factor weighs in favor of the government.

### 4.      Whether the Tip has Gone Stale

Brown does not suggest that the tip had gone stale. "[T]he criminal activity reported need not be ongoing when the officers arrive for them to nonetheless entertain reasonable suspicion sufficient to justify an investigatory stop."[136] The 911 caller reported that he had witnessed these events less than five minutes before making the call, and the police officers arrived at the scene within minutes of the call. Therefore, this factor weighs in favor of the government. Accordingly, all four factors weigh in favor of the government, and the 911 call supplied reasonable suspicion to justify a *Terry* stop.

### B.      Whether the Officers Lacked Reasonable Suspicion that Brown was Armed and Dangerous and Would Gain Immediate Access to Weapons During or After the Stop

Alternatively, even assuming that the *Terry* stop was permissible, Brown contends that the officers lacked reasonable suspicion that Brown posed a danger or that he would gain immediate control of weapons.[137] Therefore, Brown argues that a protective sweep for officer safety cannot justify the search of the vehicle.[138]

Brown relies on *Michigan v. Long*.[139] In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably

---

[136] *Id.*

[137] Rec. Doc. 50 at 9.

[138] *Id.* at 10.

[139] *Michigan v. Long*, 463 U.S. 1032 (1983).

warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."[140]

Brown suggests that the officers could not perform a protective sweep of the vehicle because he was already handcuffed before the sweep began and thus could not have immediately accessed the weapon. However, the Fifth Circuit recently rejected a similar argument. In *United States v. Rodriguez*, the Fifth Circuit held that police may search a vehicle without a warrant under the protective sweep exception to the Fourth Amendment, even if the suspect is handcuffed and detained in the back of a police car.[141]   The Fifth Circuit found that the individual could easily have returned to the vehicle because he had merely been detained, not arrested.[142]   Therefore, the appellate court concluded that the officers could conduct a protective sweep of the passenger compartment of the vehicle since the "officers had a reasonable basis to believe that Rodriguez might return to the vehicle and access a weapon."[143]   Similarly, although Brown was handcuffed at the time of the protective sweep, he was not under arrest.[144]   He was briefly detained for an investigatory stop. As discussed above, the police officers received a credible tip that Brown was "waiving a gun around" at a busy corner store. The officers had a reasonable basis to believe that Brown might return to the vehicle and access a weapon.

---

[140] *Id.* at 1049.

[141] 33 F.4th 807, 814 (5th Cir. 2022).

[142] *Id.*

[143] *Id.*

[144] Testimony of Officers Hirdes, Yarish, and Huguley.

## V. Conclusion

For the reasons discussed above, the officers had reasonable suspicion to conduct a *Terry* stop. Additionally, the officers had a reasonable basis to believe that Brown might return to the vehicle and access a weapon. Therefore, the officers also had a reasonable basis for conducting the protective sweep of the vehicle. Accordingly,

**IT IS HEREBY ORDERED** that Defendant Travis Brown's Motion to Suppress Evidence[145] is **DENIED**.

**NEW ORLEANS, LOUISIANA,** this ___8th___ day of March, 2023.

_____
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[145] Rec. Doc. 35.